CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

JUL 3 1 2014

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

|  |  |  |
|---|---|---|
| KATHLEEN V. JONES, | ) | Civil Action No. 5:13cv00066 |
|  | ) |  |
| *Plaintiff,* | ) | **REPORT AND** |
| v. | ) | **RECOMMENDATION** |
|  | ) |  |
| CAROLYN W. COLVIN, | ) | By:  Hon. James G. Welsh |
| Commissioner of the Social Security | ) |      U. S. Magistrate Judge |
| Administration, | ) |  |
|  | ) |  |
| *Defendant.* | ) |  |

The plaintiff, Kathleen V. Jones, brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of the Commissioner of the Social Security Administration ("the agency") denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"), as amended, 42 U.S.C. §§ 423 and 416(i). This court has jurisdiction pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).

## I.    ADMINISTRATIVE AND PROCEDURAL HISTORY

The plaintiff filed for disability insurance benefits on December 3, 2007, alleging an onset date of July 20, 2006, at which time the plaintiff was forty-four years of age (R. 98). Her claim was denied initially on April 15, 2008 (R. 104-116) and on reconsideration on July 11, 2008 (R. 150-152). After filing a written request for a hearing on July 18, 2008 (R. 156-157), Ms. Jones appeared and testified before an administrative law judge ("ALJ") in Winchester. Virginia on January 6, 2010 (R. 121, 182-199). In a decision dated February 17, 2010, the ALJ found the plaintiff not disabled (R. 117-130). On April 29, 2011, however, the Appeals Council

remanded the case to an ALJ for reconsideration, at least in part because the recording of the January 6, 2010 hearing was inaudible (R. 139-140).

Subsequently, Ms. Jones appeared in Charlottesville, Virginia to testify before an ALJ on February 28, 2012 (R. 12). The plaintiff was resented by counsel. Charles L. Cooke, M.D., an impartial medical witness, and Asheley Wells, a vocational witness, both testified (*Id.*). The ALJ determined that the plaintiff's degenerative disc disease and anxiety are both *severe* impairments within the meaning of the Act (R. 15-21). He determined that the plaintiff's degenerative disc disease was severe because it had the potential to limit her ability to lift or carry heavy objects and that her anxiety, "albeit mild," was also *severe* within the definition of the Act (R. 20). The ALJ adopted Dr. Cooke's determination that the plaintiff's hand and wrist pain, hypertension, and groin pain were non-severe impairments (R. 20-21; *cf.* R. 65-67 (testimony of Dr. Cooke)).

The ALJ next found the plaintiff's impairments neither met nor medically equaled the severity of a listed impairment. In reaching these conclusions he specifically examined 20 CFR, Part 404, Subpart P, Appendix 1, §§ 1.00 (musculoskeletal disorders) and 12.00 (mental disorders) (R. 21). He determined Dr. Cooke's medical opinion concerning the plaintiff's spine pain to be "strongly supported" by the treatment record and to be "reasoned and persuasive" (R. 26). Thus, he gave it "substantial weight" (*Id.*). The ALJ also gave substantial weight to the opinion of Christopher Newell, M.D., who examined the plaintiff on July 8, 2008 upon request of the state agency (R. 26, 702-704). In making his credibility assessments, the ALJ also compared the opinions of these two physicians to the "the evidence from treating sources" (R. 26), including David Switzer, M.D., a general practitioner (R. 15, 18), Stephen Phillips, M.D., a specialist in occupational medicine (R. 15-16), Bart Balint, M.D., a specialist in pain management who employs Debra Welk, a nurse practitioner (N.P.) (R. 16-17), Lisa Rader, N.P.,

2

at Advanced Pain Relief Centers, Inc. (R. 18), John Zoller, III, M.D., an orthopedist (*Id.*), and Sheryl Johnson, M.D., of the Pain Clinic at the University of Virginia (R. 18, 19).

With regard to her alleged anxiety, the ALJ gave substantial weight to the opinion of Lora Baum, Ph.D., who had performed a consultive psychological evaluation of Ms. Jones on January 8, 2010 (R.25, 27). In doing so, he noted that Dr. Baum was the mental health specialist to have evaluated or treated Ms. Jones, and he specifically referenced the fact that the objective medical evidence supported her findings and diagnosis (*Id.*).

The ALJ did not consider the opinion of Dr. Switzer, as expressed in a letter dated August 1, 2011 (R. 829), to be of any probative value since it was inconsistent with his prior examinations, provided no supporting medical evidence in itself (R. 26), and invaded the pertinent reserved rights of the Commissioner pursuant to SSR 96-5p. In addition, the ALJ discounted the opinion of the state agency that Ms. Jones was capable of only sedentary work (R. 108-111) on the ground that that opinion is not supported by the relevant medical evidence (R. 26).

In determining the credibility of the plaintiff herself, pursuant to 20 CFR § 404.1529(a-c) the ALJ considered, first, the medical evidence supporting the alleged impairments and symptoms and, second, the plaintiff's own description of her daily activities (R. 24-25). He then concluded that while Ms. Jones did allege impairments that are medically determinable and would likely result in the alleged symptoms (R. 25); however, her allegations regarding the intensity, persistence, and limiting effects were not credible given the description of her daily activities and the minimal objective and clinical findings (R. 25-26).

After further concluding the plaintiff was no longer functionally able to perform her past relevant work, and based on the vocational witness' responses to hypothetical questions posed by

3

the ALJ and the plaintiff's attorney, the ALJ determined that Ms. Jones was "not disabled" and capable of "at least" unskilled light work (R. 26).

On May 7, 2012, Ms. Jones submitted a request for review of the ALJ's decision to the Appeals Council (R. 7), and on April 26, 2013, the Appeals Council denied the plaintiff's request, affirmed the ALJ's decision, and adopted the ALJ's opinion as the final decision of the agency and its Commissioner (R. 1-6). Subsequently, the plaintiff timely filed a request for court review and submitted a complaint on June 21, 2013 (docket #1). The defendant filed an Answer (docket # 4) and the Administrative Record (docket # 5) on October 28, 2013. The plaintiff filed her motion for summary judgment and two-page supporting memorandum on November 25, 2013 (docket ## 9-10); the defendant's motion and memorandum were filed on December 30, 2013 (docket ## 11-12). Oral argument on the competing motions for summary judgment was held telephonically on April 24, 2014. By standing order, this case is before the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## II.    ISSUES PRESENTED ON APPEAL

The plaintiff presented four issues to the court during oral argument, contending that (1) the record does not support the finding that Ms. Jones does not have an impairment meeting listing 1.04; (2) the ALJ improperly discounted or failed to consider Nurse Welk's treatment; (3) the ALJ failed to discuss the plaintiff's anxiety or consider the cumulative effects of her impairments; and (4) the ALJ posed inaccurate hypothetical questions to the vocational expert that did not reflect the plaintiff's actual condition.

## III.    SUMMARY RECOMMENDATION

Based on a thorough review of the administrative record, and for the reasons herein set forth, it is **RECOMMENDED** that the plaintiff's motion for summary judgment be **DENIED**,

that the Commissioner's motion for summary judgment be **GRANTED**, that final judgment be entered **AFFIRMING** the Commissioner's decision denying benefits, and that this matter be **DISMISSED** from the court's active docket.

## IV.    STANDARD OF REVIEW

When reviewing the Commissioner's final decision, a federal court is limited to determining whether the "factual findings of the [Commissioner] . . . are supported by substantial evidence and were reached through application of the correct legal standard." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). If the factual findings are determined to have the proper support and result from the application of the proper standard, the court must uphold the decision. *Id.* Substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). "In reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ]." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig*, 76 F.3d at 589). Furthermore, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id.* (internal quotation marks omitted). The court will now address the question of "whether the ALJ's finding of no disability is supported by substantial evidence." *Id.* (citing *Craig*, 76 F.3d at 589).

## V. THE ADMINISTRATIVE RECORD

### *Age, Education and Vocational Experience*

At the time of her alleged disability onset date in July 2006, Ms. Jones was forty-four years of age, and she turned fifty years of age shortly after her insured-status expired on

5

December 31, 2011 (R. 41, 62, 63). She has a high school equivalent education (R. 42). She last worked as a line packer at Family Dollar, a job classified by the vocational witness as unskilled and medium in exertional level (R. 91).

Her past relevant employment also included work as a forklift operator for two different manufacturing companies and a job tending a compression-molding machine for a car door manufacturer (R. 91). As generally performed, operating a forklift is semi-skilled and exertionally medium; according to the plaintiff's work record, however, she performed this work at a light exertional level at times and at other times at a heavy exertional level (R. 45-46). Work as a molding machine tender is listed as unskilled and exertionally light; however, according to the plaintiff's work history, she performed this work at a medium exertional level (R. 44-45, 91-92).

According to the plaintiff, she has been experiencing disabling daily low back pain since July 20, 2004. She describes this pain as radiating into both lower extremities down to her toes. She rates her pain level at eight (on a zero to ten scale), and this has required her use of prescription pain relievers "every day" since July 2006 (R. 46-47).

### Relevant Medical Evidence

Without any previous history of back pain (R. 781-785, 798, 800, 802-804, 834-835, 935-943, 947-951), on September 2, 2004, Ms. Jones "pulled her low back" in a work-related incident (R. 429, 441). She experienced a "pop in her lower back" and felt intermittent pain radiating into her left leg (R. 441). After using aspirin at home without improvement, on September 13, 2004 she sought treatment through Rockingham Memorial Hospital ("RMH") Center for Corporate Health (Id.). A nonsteroidal anti-inflammatory and physical therapy were prescribed, and she was placed on short-term disability (R. 432-434, 437). A lumbar MRI on

6

October 29, 2004 demonstrated a small disc bulge at L5/S1 without any anatomic alignment abnormality (R. 444-446). On December 14 she was released "with no further treatment needed" and permitted to return to work without restrictions (R. 431).

Ms. Jones next sought medical treatment eighteen months later, when she was seen at Page Memorial Hospital's emergency room on July 6, 2006 for treatment of multiple leg lacerations and abrasions incurred when she fell through a glass door during an argument with her boyfriend (R. 418-419, 895, 898-899). She was fully ambulatory, able to weight-bear, and reported no neck, back, or chest pain (R.898). The various lacerations were closed as appropriate by the use of stitches or Derma-bond; a foreign body was removed from the right knee; she was given a prophylactic tetanus booster shot and antibiotics; and she was released to return to work without restrictions on July 7, 2006 (R. 900-901, 913). On July 14, as a "walk-in patient" she saw David Switzer, M.D., her primary care provider, principally for follow-up treatment of her hypertension and associated InnoPran and hydrochlorothiazide refills (R. 418-419, 659-660). On examination, Dr. Switzer found a "trace" amount of ankle swelling due to fluid retention with no calf tenderness, no sign of any deep vein thrombosis and no other medically significant lower extremity abnormality (Id.).

The record contains no suggestion that Ms. Jones sought medical treatment between 2004 and the summer of 2006 for any residual medical problem related to her work-related back injury (R. 781-785); only an RMH treatment note dated September 11, 2007 records her report of a "flare[] up" in June 2006 (R. 457). Apparently, in response to this "flare up," the workers compensation carrier had her seen by Stephen Phillips, M.D., on July 20, 2006 for an occupational assessment (See R. 422-426). In his responses to a form questionnaire, Dr. Phillips opined that the residuals of her back injury were such that she was no longer able to work in her

7

current position as a forklift operator due to chronic back pain. She did, however, remain functionally able to lift and carry 50 pounds occasionally, to lift and carry 10 pounds regularly, to stand and walk at least 2 hours during a normal workday, to sit for 6 hours during a normal workday, to use her hands for repetitive gross and fine manipulation, to use both lower extremities for the operation of foot controls and to perform postural activities occasionally (R. 420-421).

When Ms. Jones was seen by her primary care provider on September 1, she reported continuing low back pain. On examination, however, Dr. Switzer found no tenderness or muscle spasm and no loss of lower extremity motor strength, and he referred her for a pain management consultation (R. 658). The following month she was seen for the first time by Bart Balint, M.D., of Balint Pain Management Clinic. At that time the plaintiff was using only an over-the-counter pain reliever (R. 590). On examination, Dr. Balint (including by extension his employee, Debra Welk, N.P.) found the plaintiff to have some spinal range-of-motion restriction and some tenderness; however, she exhibited full range of motion in all extremities, a normal gait, normal balance, normal sensory reflexes, and no atrophy, weakness or loss of sensation (R. 590-592). Based on his diagnoses of degenerative lumbar disc disease, lumbosacral spondylosis and lumbago, he prescribed a pain reliever (Ultram) and physical therapy (R. 592).

Later dated office records of her primary care physician show that in December 2006 she reported problems with anxiety and stress, and Dr. Switzer prescribed a low dose of lorazepam for her use on an as-needed basis (R. 657). In June 2007 she reported continued mood and anxiety issues; her lorazepam dosage was increased and Depakote added as an additional treatment medication (R. 652). One month later, however, she reported that she stopped taking the Depakote after only one pill; "it slowed her down too much" (R. 651). In addition to refilling

8

her InnoPran prescription, at that time Dr. Switzer prescribed meloxicam as an anti-inflammatory for her low back pain (*Id.*). She next saw her primary care provider in August 2007; at that time Dr. Switzer recorded no back-related complaint, only some "heaviness" in the front of her neck (R. 650). Similarly, when he saw Ms. Jones in January 2008, Dr. Switzer did not record any specific back-related complaint; he did, however, give her prescriptions of citalopram and lorazepam for continuing medication management of her anxiety (R. 649).

A review of Dr. Balint's office records, variously dated between November 2006 and November 2007[1] (R. 593-628), reflect Ms. Jones' reports of ongoing low back and leg pain and attendant sleep difficulties (R. 596, 611, 614, 620) as well as her reports of only limited, intermittent or short term pain reduction. The records also reflect Dr. Balint's diagnostic and treatment modalities during this period. X-ray results during this period showed only "mild" degenerative lumbar disc disease with no acute spondylolisthesis, and the results of a lumbar discograph and a lumbosacral CT scan demonstrated posteriolateral annual tears at L3/4 and L4/5 and a posterior disc protrusion at L5/S1 (R. 608, 632, 631). Dr. Balint's treatment opinions during this period included physical therapy (R. 593), periodic medial branch nerve blocks (R. 547, 599, 605, 624), a medication regime that included Ultram, Celebrex and Mobic (R. 600, 605, 617, 625) and installation of a spinal stimulator (R. 617, 627, 630).

As part of the state agency's work-up, a consultive medical examination was performed by Christopher Newell, M.D., on July 9, 2008 (R. 712-715). In the medical history she gave to Dr. Newell, the plaintiff reported having chronic low back pain exacerbated by postural movements due to an L5/S1 disc protrusion; she reported no lower extremity radiculopathy and that use of the spinal cord stimulator helped "a little." She reported being self-care independent

---

[1] A state agency contact with Dr. Balint's office in June 2008 documents that he last saw the plaintiff on November 6, 2007 (R. 700-701).

9

and able to do household chores; she was not using a brace or other device to assist with ambulation; she was able to get on and off the examining table without assistance; and she denied any bowel or bladder symptoms (R.712-713). Dr. Newell found her to be alert and oriented in all spheres, to exhibit a "normal" mood and affect, and to possess logical and linear thought processes (R. 713). His physical examination findings were notable for some lumbosacral tenderness, decreased lumbar extension, and bilateral paravertebral muscle spasms; however, she had normal spinal flexion, no sciatic pain of straight leg rise, "normal" bilateral range of upper extremity motion, "normal" cervical spine, "normal" sensory examination results, symmetric reflexes bilaterally, 5/5 strength in all extremities, and a "normal" gait, station and coordination (R. 713-714).

Consistent with his diagnosis of lumbar degenerative disc disease and his findings on examination, Dr. Newell assessed Ms. Jones to be functionally able to stand or walk about six hours during a normal workday, sit during a full workday, occasionally lift or carry 20 pounds, regularly lift or carry 10 pounds, and occasionally make postural movements (R. 715). In addition he noted no visual, manipulation or communication limitations and no medical need for the use of any assistive device for ambulation (*Id.*).

Beginning in March 2009 and continuing through the February 2012 hearing date, the plaintiff sought evaluation or treatment, or both, by a number of different health care providers, including Advanced Pain Relief Centers (Lisa Rader, N.P.) (R. at 720-723), Winchester Orthopaedics (John Zoller, M.D.) (R. at 724-727), UVa Health System's Pain Clinic (Sheryl Johnson, M.D.) (R. at 731-736, 759-765), Shenandoah Valley Health (R. at 728-730) and Lora Baum, Ph.D. (R. at 737-739). During this three-year period, the plaintiff was also seen irregularly at Page Health Care Associates, generally by a licensed practical nurse, for the

10

purpose of monitoring her high blood pressure, pain medication management and various unrelated, generally transient, medical concerns (R. 740-758, 766-768, 797, 812-816, 826-828, 831-834, 841-846, 847-849, 858-867, 953-963, 989-996. 1001-1003, 1016-1020).

At Advanced Pain Relief Centers Ms. Jones sought treatment on March 3, 2009 for "constant, severe, and aching" low back pain (R. 720-723). She reported a history of radicular bilateral leg pain, weakness of the upper leg, increased pain with back extension, twisting and lifting and paresthesia in her toes and fingers (R. 720); the plaintiff also reported that her spinal cord stimulator and Celebrex had provided some relief (*Id.*). Nurse Rader noted that the patient "denies any impact from the pain on activities of daily living" and can "handle" these activities (R. 720-721). Nurse Rader observed, however, that while Ms. Jones appeared "normal" and "alert" in all respects, she did "seem[] to be in moderate pain" (R. 721-722). Physical exams Nurse Rader conducted revealed decreased range of motion and pain with back flexion and extension; tenderness in the general lumbosacral area; "normal" gait; normal reflexes and sensation; and 5/5 strength in all major muscle groups (R. 722). Nurse Rader prescribed Celebrex and recommended that Ms. Jones seek both reprogramming of her spinal cord stimulator and medical care at the free clinic (R. 722).

Ms. Jones went to Winchester Orthopaedic Associates on May 8, 2009 complaining of back pain and inquiring about surgical treatment options (R. 724, 727). Ms. Jones reported pain in the low back, bilateral buttocks and the groin, particularly the right groin (*Id.*). She denied any other leg pain (*Id.*). Dr. Zoller's physical examination revealed some tenderness at the lumbosacral junction and back pain upon lumbar extension; her hip rotation was pain free with no noted limitation, the straight leg test was negative, reflexes were +1 and symmetric and the motor exam was 5/5 (*Id.*). After examining the x-rays and the plaintiff's 2004 MRI, Dr. Zoller

11

noted some minor degenerative changes and a slight retrolisthesis; his overall impression was that the x-rays and her 2004 MRI were "fairly unremarkable" (R. 724-725). Since Ms. Jones primarily complained of axial spine pain (suggesting no neurological problems), and was a heavy smoker, Dr. Zoller did not consider her to be a candidate for surgical intervention.

Dr. Balint referred Ms. Jones to UVa Health System Pain Management Center for further treatment of her groin pain on August 17, 2009 (R. at 734). Ms. Jones complained of chronic groin pain occurring over the course of the past six months, and she further stated that Celebrex and Excedrin did not relieve the pain (*Id.*). On physical examination, straight leg tests and Patrick's test were negative bilaterally, but the plaintiff reported increased groin pain with flexion; tests also identified decreased sensitivity to light touch and cold along the L2 dermatome, symmetric bilaterally (R. 735). The examiner also noted full strength in the lower extremities and suggested that the groin pain is neuropathic but not related to compression (*Id.*). The physician prescribed Neurontin (gabapentin), an anticonvulsant, and recommended reprogramming her spinal cord stimulator (R. 736).

At Shenandoah Valley Health, Ms. Jones presented as a new patient on September 17, 2009 complaining of injuries to her hand sustained when she fell in her yard about four months prior to her visit (R. 729). Ms. Jones claimed 6/10 pain and also noted some swelling around her knee (*Id.*). Examination revealed gross swelling over the metacarpophalangeal joints of the index, long, and ring finger of the right hand (*Id.*). The plaintiff had full range of motion in that hand, though she reported pain on extension (*Id.*). The nurse performing the examination also noted that the plaintiff had brisk capillary refill, was neurovascularly intact, had intact skin and exhibited no signs of instability upon stressing of the ligaments in each finger (*Id.*). In addition, Ms. Jones had full range of motion and strength in all flexor and extensor tendons, denied pain

12

with palpation along base of the thumb and had a negative Finkelstein's test (*Id.*). The plaintiff had full range of motion in her wrist as well (*Id.*). The one result that made the examiner nervous was the significant pain on palpation along the anatomical snuffbox (*Id.*). The nurse suggested looking into an MRI or CT scan to more fully examine the condition of her bones, ligaments, and tendons (*Id.*).

Ms. Jones returned to Shenandoah Valley Health on October 8, 2009 for a follow-up after getting a CT scan of her right hand and wrist (R. 728). The plaintiff reported somewhat improved pain, rating it a 5/10 (*Id.*). Once again, the plaintiff retained full range of motion and reported pain on palpation of the anatomical snuffbox (*Id.*). The CT scan revealed cystic changes of the scaphoid and capitate bones, but did not indicate any fractures, dislocations or other abnormalities (*Id.*). The examiner believed that the only treatment would be to "keep an eye on it" and make sure her condition did not deteriorate; a referral to a hand specialist was recommended (*Id.*). The record, however, contains no information regarding any follow-up treatment by or visit to a hand specialist.

Ms. Jones followed-up at the UVa Pain Management Center on November 23, 2009 for reprogramming of her spinal cord stimulator and medication adjustments (R. 731-732). Physical examination once again revealed 5/5 strength in all extremities, but the examiner on this occasion noted "very mild" hip flexion weakness, giving a 4+/5 rating (R. 732). The plaintiff's light touch sensitivity was also intact at that time, but mild allodynia presented over the medial thigh (*Id.*). Her gait was normal, and her Romberg's test was negative (*Id.*). The reprogramming was immediately reported to ease the back pain (*Id.*). In addition, gabapentin was discontinued and Topamax was prescribed in order to assist with sleep problems and promote weight loss (*Id.*).

13

Dr. Lora Baum, a psychologist in Charlottesville, Virginia, performed a psychological evaluation of Ms. Jones on January 8, 2010 at the request of Dr. Johnson from the UVa Pain Center (R. 738). The goal of this evaluation was to assess the plaintiff's "coping and adjustments as well as her suitability for cognitive behavioral pain techniques" (Id.). Dr. Baum reported that Ms. Jones was cooperative, though irritable, and presented normal affect, attention, speech, language, insight, fund of knowledge and judgment; her thought process was "a little tangential," but she exhibited no racing thoughts, anhedonia, hopelessness or suicidal ideation. Ms. Jones discussed some of her daily activities as well as other family members who have chronic pain issues (Id.). She also exhibited resistance to the idea that this type of therapy could ease her pain (Id.) and turned down an opportunity to learn relaxation techniques (R. 739). Dr. Baum diagnosed her with a panic disorder without agoraphobia and gave her a Global Assessment of Functioning score, both current and highest in the past year, of 65.[2]

During a further follow-up visit to UVa Pain Management Center on February 24, 2010, the examiner noted no physical changes, bilaterally negative straight leg raises and that, unfortunately, Ms. Jones was not interested in psychological treatment to help ease her pain (R. 761-763). Ms. Jones returned to UVa Pain Management Center again in April 2010 complaining of neck pain, and again the physical examination revealed bilaterally negative straight leg raises and no deterioration of her physical condition (R. 759-760).

### Medical Evidence after Last-Insured date

The plaintiff's medical records dated after December 31, 2011 document no medically significant adverse change in her medical condition or in her functional abilities (R. 965-968,

---

[2] The DSM-IV-TR (current until 2013 and in use at the time of Dr. Baum's report) describes a person in the decile between 61 and 70 as having "mild symptoms OR some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." Am. Psychiatric Ass'n, THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed., text rev., 2000).

970-983, 984-988, 998-1000, 1005-1014). She continued to receive conservative care, counseling, and as of February 22, 2012 (six days before her administrative hearing) "no more than 3 percocet a day" (R. 967-968)

### State Agency Medical Consultants [3]

Based on an overall case review and assessment of the plaintiff's exertional and non-exertional limitations, Luc Vinh, MD, a state agency medical reviewer, concluded the plaintiff's anxiety, pain and other symptoms she described were not consistent with her activities of daily living or her treatment record (R. 99-116). In his opinion she retained the functional capacity to perform sedentary work (R. 108-116). This assessment was ultimately rejected by the ALJ based on his conclusion that the evidence was insufficient to warrant such limitations (R. 26).

### Medical Witness Testimony

Charles L. Cooke, M.D., an impartial medical expert, testified at the hearing before the ALJ on March 15, 2012 (R. 64-76). In preparation for his testimony, the expert reviewed Exhibits 1F through 27F (R. 64), which he deemed sufficiently thorough to allow him to reach a determination of the plaintiff's health status (R. 65). In his examination of the record, Dr. Cooke reviewed the following ailments: hypertension, osteoarthritis of the right hand, groin pain, low back pain, and mental health problems. Dr. Cooke determined the first three ailments to be mild (R. 65-67), since, first, the blood pressure problems responded well to medication (R. 65), second, the osteoarthritis did not result in a limited range of motion or any objective changes (R. 65) and, third, the groin pain neither proved to be related to the back problems nor resulted in significant limitation of motion (R. 66-67). The medical expert did not substantially address the

---

[3] State agency medical and psychological consultants are "highly qualified … experts in the evaluation of the medical issues in disability claims under the Social Security Act." 20 C.F.R. § 404.1527(e)(2)(i);

Case 5:13-cv-00066-MFU-JGW  Document 15  Filed 07/31/14  Page 15 of 25  Pageid#: 1112

plaintiff's mental health issues, merely noting her GAF score of 65 (R. at 68), but this may have been because the ALJ requested that the testimony focus on the physical ailments (R. 65).

Dr. Cooke opined that the low back pain was the most problematic of the ailments (R. 67), but still did not meet a listing (R. 68-69, 73-75). Since the plaintiff's neurological testing produced normal results (*see* R. 68), there was no sign of arachnoiditis (R. 69), and what minor stenosis did occur did not place any pressure on a nerve or the spinal cord (R. 69), the plaintiff could not meet any of the impairments listed in 1.04. In addition, the expert, as well as the ALJ, made it clear to the plaintiff's attorney that degenerative disc disease on its own does not meet the requirements of 1.04 (R. 73-75).

The medical expert did, nonetheless, offer work restrictions that he believed would be supported by the objective medical evidence contained in the record (R. 71). He first suggested that the plaintiff not be permitted to work in hazardous environments since her pain might distract her from her tasks and make the work even more hazardous (*Id.*). Furthermore, Dr. Cooke specifically forbade any climbing of "scaffolds, ropes and things of this nature" (*Id.*). Dr. Cooke did not, however, find any loss of fine manipulation, difficulty ambulating, or necessary environmental, visual, or communicative restrictions (*Id.*). Finally, Dr. Cooke did not give much weight to the work restrictions that other doctors placed on Ms. Jones since they relied primarily on subjective patient statements and not on objective medical test results (R. 71-72).

### *Vocational Witness Testimony*

The ALJ at the March 15, 2012 hearing posed three hypothetical questions to the vocational expert. The first hypothetical (R. 94) asked the vocational expert to consider a person who is capable of "light work" (*see* R. 70); cannot climb ladders, ropes, or scaffolds (*see* R. 71); cannot have concentrated exposure to hazards (*see id.*); cannot tolerate contact with the public

(*see* R. 79); has the ability to undertake simple, repetitive tasks (*see* R. 738-739); sustains concentration for a customary period (*see id.*); interacts normally with coworkers and supervisors (*see* R. 715, 738-739.); and responds appropriately to change in a routine setting (*see* R. 738-739).

The second hypothetical asked the vocational expert to consider a person who could sit for six hours; walk or stand for two hours; frequently lift 10 pounds and occasionally 20 pounds; occasionally bend, squat, climb, and crawl; frequently reach above the shoulders; and could not have concentrated exposure to hazards (R. 94). These restrictions allowing sedentary work were derived from the report of Dr. Phillips (*Id.*, *see* R. 421).

Finally, the ALJ asked the vocational expert to consider someone able to walk, stand, or sit for no more than 5 to 10 minutes at a time; able to lift no more than eight pounds; required to lay down intermittently; and suffering from a combination of impairments interfering with concentration, pace, and persistence more than two days per month (R. 94). These restrictions constitute all those the plaintiff alleged (*Id.*).

The vocational expert responded that, in either of the first two hypothetical questions there would be a significant number of qualifying jobs in Virginia available to that person (R. 93), but that a person such as in the third hypothetical would not be able to work in the national economy (*Id.*).

## V.    DISCUSSION

### *Claim One: Listing 1.04*

On appeal, the plaintiff claims that the ALJ erred in determining that her impairments do not meet or equal the requirements of listing 1.04 but fails to demonstrate either how the evidence upon which the ALJ relied was insubstantial or that the ALJ applied the law

incorrectly. In determining whether an impairment meets the 1.04 listing requirements, the ALJ must examine all available diagnostic and laboratory test results and any medically acceptable and appropriate imaging. 20 CFR Ch. III, Pt. 404, Subpt. P, App. 1, § 1.00(C)(1). A plaintiff alleging a 1.04 impairment must be able to show a disorder of the spine — such as spinal stenosis, osteoarthritis, or degenerative disc disease, among others — that results in compromise of a nerve root or the spinal cord. *Id.* at § 1.04. In addition, the plaintiff must prove either nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. *See* § 1.04(A-C).

To prove nerve root compression pursuant to 1.04(A), a plaintiff must provide evidence of neuroanatomic distribution of pain, limited motion of the spine, motor loss with sensory or reflex loss, and, if the lower back is involved, a positive straight-leg raising test must also be shown. To prove spinal arachnoiditis pursuant to 104(B), a plaintiff must provide confirmation by means of an operative note, pathology report of a tissue biopsy or appropriate medical imaging; the impairment must be characterized by severe burning or dysesthesia that requires the plaintiff to change position more than once every two hours. To prove lumbar spinal stenosis resulting in pseudoclaudication pursuant to 1.04(C), a plaintiff must provide confirmation by means of appropriate medical imaging; the impairment must be characterized by chronic nonradicular pain and weakness, as well as an inability ambulate effectively.

The ALJ, relying on objective medical test results, determined that the plaintiff did not satisfy any of the three requirements. Multiple medical experts administered diagnostic exams to identify any limitations in spine motion (R. 704, 714, 722), strength (R. 658, 703, 714, 722, 724), and reflexes (R. 703, 722, 724). Since the plaintiff was complaining of lower back pain, straight leg tests were administered (R. 658, 714, 724). Though plaintiff was determined to have a

18

decreased range of motion in the spine (R. 658, 722; *but see* R. 602), her test results were otherwise normal, with all medical experts reporting normal mobility, strength, and reflexes as well as negative straight leg tests.

In addition, neither the medical evidence nor the plaintiff's testimony indicate that the plaintiff meets 1.04(B). She never complained of burning or dysesthesia, and no operative report or imaging indicated arachnoiditis; no doctor sought to perform a tissue biopsy. With regard to 1.04(C), no significant spinal stenosis was found (R. 548, 845), the plaintiff did not suffer from weakness and nonradicular pain (R. 703, 722) or find herself unable to ambulate effectively, as defined in § 1.00(B)(2) (R. 539, 703). A finding that Ms. Jones does not meet the listing requirements of 1.04 is plainly supported by substantial evidence produced by Dr. Newell, whom the ALJ found to be very credible (R. 27) and Dr. Zoller, a specialist in orthopedics (R. 22). Since the ALJ, in determining that the plaintiff does not meet the listing requirements of 1.04, relied on appropriate medical test results and imaging and did not fail to consider any of the evidence, the court must uphold his decision.

### Claim Two: Medical Opinion Evidence of Debra Welk, N.P.

Ms. Jones next claims that the ALJ failed to give proper consideration to the medical opinion of Nurse Welk; this claim fails because the ALJ gave sufficient consideration to the medical evidence from Balint Pain Management Clinic, of which Nurse Welk is an employee. As a nurse practitioner, she works as part of a "patient care team" with Dr. Balint, and under Virginia's strict statutory regime, Nurse Welk and Dr. Balint must "maintain appropriate collaboration and consultation" with each other. Va. Code Ann. § 54.1-2957 (2012); *see also* 18 VAC 90-30-120 (2013). Since the "charts or electronic patient records" that a nurse practitioner produces must be "periodic[ally] review[ed] . . . by a patient care team physician," 18 VAC 90-

19

30-122 (2013), Dr. Balint must have approved and adopted Nurse Welk's assessments and determinations (*see, e.g.*, R. 590-592, 599-601), thus guaranteeing that any consideration of Dr. Balint's medical opinion would include a consideration of Nurse Welk's medical opinion.

In addition, the procedure for determining the credibility of a nurse practitioner's medical opinion are the same as that used for evaluating the opinion of an "acceptable medical source," such as a licensed physician like Dr. Balint. 20 CFR § 404.1513; *see* Social Security Ruling 06-03p, 2006 SSR LEXIS 5 at *10-12. The fact that the process for determining credibility is identical for physicians and nurse practitioners further supports the assertion that any consideration of Dr. Balint's medical opinion is equivalent to a consideration of Nurse Welk's.

In determining the credibility of a medical source's opinion, the ALJ will typically consider the six factors enumerated in 20 CFR § 404.1527(c)(1-6). Medical opinions, however, are limited to statements that reflect judgments about the nature and severity of any impairments or commentary on any symptoms, diagnosis and prognosis, abilities of the patient suffering from the impairments and physical and mental restrictions placed on the patient. 20 CFR § 404.1527(a)(2). Statements by a medical source that claim a patient is disabled or meets the requirements of a listed impairment, describe residual functional capacity or apply vocational factors are not considered medical opinions, *see* 20 CFR § 404.1527(d)(1-2), and such determinations are reserved to the Commissioner, 20 CFR § 404.1527(d). Additionally, any medical opinion must be accompanied by substantial proof in the form of objective medical test results or imaging. *See* 20 CFR § 404.1527(c)(3).

In this case, the "opinion" of Nurse Welk and Dr. Balint that the ALJ allegedly did not consider was in fact a conclusory statement that Ms. Jones was "impaired ... from work" (R. 613); since that is not a qualifying medical opinion, the ALJ had no obligation to discuss the

20

credibility of it. Neither Dr. Balint nor Nurse Welk included any description of the inability or any objective indices of severity of the symptoms. Moreover, because Dr. Balint's treatment notes do not support his conclusion (compare this conclusion with findings that Ms. Jones "ambulates well," is "alert," and "oriented," R. 539, 564, only reports pain on bending or prolonged standing, R. 590, medication producing "no side effects," R. 595), the opinion is substantially based on patient testimony and not objective test results, his conclusion is inconsistent with other, credible, opinions contained in the record (*see* Report of Dr. Newell, R. 713-715) and Dr. Balint is a specialist in pain management, not orthopedics, rheumatology, or neurology, Dr. Balint's opinion is not otherwise deserving of significant weight. *See* 20 CFR § 404.1527(c)(1-6). Claim two, therefore, fails because the ALJ conducted an appropriate examination of the record and properly evaluated the medical evidence of Balint Pain Management Clinic.

### Claim Three: Consideration of Anxiety

The plaintiff claims that the ALJ erred by failing to consider plaintiff's anxiety, her visits to and treatment by Drs. Baum and Switzer, and the joint effects of anxiety and plaintiff's other impairments; this claim, however, cannot find substantiation in the record. Given that "[i]t is axiomatic that disability may result from a number of impairments," the Fourth Circuit "has on numerous occasions held that in evaluating the effective [*sic*] of various impairments upon a disability benefit claimant, the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). The ALJ is specifically required to consider "the combined effect of all physical and mental impairments" in making the determination of disability. *Reichenbach v. Heckler*, 808 F.2d 309, 312 (4th Cir. 1985) (citing *DeLoatche v. Heckler*, 715 F.2d 148 (4th Cir.1983)).

21

In the instant case, the ALJ considered each of the plaintiff's impairments, and the combination thereof, sufficiently. With regard to the plaintiff's anxiety, the ALJ considered the plaintiff's visits to Dr. Switzer, the resulting prescriptions for lorazepam and Depakote (R. 15) and the report and diagnosis of Dr. Baum (R. 19). The ALJ then undertook the required "paragraph B" and "paragraph C" analyses to determine if Ms. Jones had a disabling mental impairment (R. 22-24; *see* 20 CFR § 404.1520a (explaining the procedural requirements for evaluating mental impairments)). Moreover, the ALJ correctly gave Dr. Baum's report substantial weight (R. 27) based on her examining relationship with Ms. Jones, the thoroughness of her evaluation (R. 738-739), her evaluation's consistency with the reports of other physicians who examined her (*see, e.g.*, R. 649, 652) and her specialization in mental health.

In addition, the ALJ included a symptom of anxiety in the first hypothetical question posed to the vocational expert when he asked Ms. Wells to consider a person incapable of working in a position requiring routine contact with the public or customers (R. 92-93); this restriction relies on the patient's testimony, which in fact alleges greater severity than Dr. Baum determined (compare R. 739 (no reported signs of agoraphobia) with R. 79 (fear and avoidance of enclosed spaces and crowds)). Moreover, the ALJ asked the vocational expert in the third hypothetical question to consider someone suffering from a combination of impairments interfering with concentration, pace, and persistence more than two days per month (*see* R. 85), which is another factor related to anxiety. Two of the hypothetical questions, therefore, demonstrate that the ALJ considered the combined effects of the plaintiff's two severe impairments. Thus claim three fails because the record supports the contrary finding that the ALJ properly considered the impact of anxiety in combination with the plaintiff's other impairments.

### *Claim Four: Hypothetical Questions Posed to Vocational Expert*

22

Ms. Jones finally claims that the ALJ erred in posing hypothetical questions to the vocational expert that did not accurately reflect the plaintiff's ability to work as described in the record; this claim fails because the record patently undermines the contention. "The purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform." *Walker*, 889 F.2d at 50. The testimony of a vocational expert must find support in the record for it to be of use in the ALJ's decision-making process, and the opinion must not rely merely on the testimony of the claimant given at the hearing but consider the "entire record." *Id.* at 50-51.

On review, the first hypothetical (R. 92-93) represented a combination of work restrictions the ALJ developed by examining the record and considering the hearing testimony. It tracks exactly the findings of the ALJ in his opinion; it reflects the functional criteria he determined to be the most credible limitations in the record and hearing testimony, both lay and expert (*cf.* R. 24). The second hypothetical (R. 94) represented the restrictions that Dr. Phillips laid out in his report (R. 421) and thus was equally well founded. The third hypothetical represented the work restrictions that Ms. Jones herself alleged (R. 94).

The vocational expert, therefore, had the opportunity to consider numerous impairments and specific limitations supported both in the record and in the testimony at the administrative hearing.

In short, the record demonstrates that the ALJ posed hypothetical questions to the vocational expert that explicitly listed a host of restrictions finding support in the record. Moreover, the ALJ asked the vocational expert to consider seriously the impact of every one of the plaintiff's alleged restrictions in combination. Ms. Wells considered the impairments and limitations both found within the record and noted in the plaintiff's testimony at the hearing.

23

Since the vocational expert's opinion testimony was derived from a consideration of factors supported by substantial evidence in the record, the ALJ's reliance on this testimony is logically supported by substantial evidence as well. Thus claim four fails because the ALJ relied on testimony from the vocational expert given in response to proper hypothetical questions that found substantial support in the record.

## VII.    PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis and on the basis of a careful examination of the full administrative record, the undersigned submits the following formal findings, conclusions, and recommendations:

1.   The plaintiff was 49 years of age at the time her insured status expired;

2.   The plaintiff has the equivalent of a high school education;

3.   Her past relevant work includes work as a fork lift driver, compression-mold machine tender and line packer;

4.   The plaintiff has not engaged in substantial gainful work activity since her alleged onset date (July 20, 2006);

5.   The plaintiff has the following severe impairments: degenerative disc disorder and anxiety;

6.   The plaintiff does not have an impairment, or combination of impairments, that meets or medically equals one of the listed impairments in 20 CFR Pt. 404, Subpt. P, App. 1;

7.   The plaintiff does not have an impairment or combination of impairments that functionally equals a listed impairment;

8.   The ALJ appropriately considered the plaintiff's anxiety and the cumulative effects of her impairments;

9.   The ALJ properly considered all of the medical evidence contained in the medical record, including, but not limited to, Nurse Welk's treatment notes;

10.   The ALJ's hypothetical questions to the vocational expert fairly set forth the plaintiff's limitations during the decisionally relevant period;

11. The plaintiff has not been disabled, as defined in the Social Security Act, from her alleged disability onset date (July 20, 2006) through her date last insured (December 31, 2011);

12. Substantial evidence in the record supports the Commissioner's final decision, and it is free of legal error;

13. The plaintiff has not met her burden of proving a disabling condition on or before the date of the ALJ's decision; and

14. The final decision of the Commissioner should be affirmed.

## VIII. TRANSMITTAL OF THE RECORD

The clerk is directed to transmit the record in this case immediately to the presiding United States district judge and to transmit a copy of this Report and Recommendation to all counsel of record.

## IX. NOTICE TO THE PARTIES

Both sides are reminded that, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, they are entitled to note objections, if any they may have, to this Report and Recommendation within fourteen (14) days hereof. **Any adjudication of fact or conclusion of law rendered herein by the undersigned to which an objection is not specifically made within the period prescribed by law may become conclusive upon the parties.** Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitals or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objections.

ENTER: This 31st day of July 2014.

*s/ James G. Welsh*

U. S. Magistrate Judge

25